# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **AVA V. MULLINS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:06cv00035 |
| | ) | |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**,[1] | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

## *I. Background and Standard of Review*

Plaintiff, Ava V. Mullins, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq*. (West 2003 & Supp. 2006).  Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).  This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B).  As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

Case 2:06-cv-00035-JPJ-PMS   Document 20   Filed 04/30/07   Page 1 of 28   Pageid#: 95

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Mullins protectively filed her initial applications for DIB and SSI on August 20, 1999, alleging disability as of August 15, 1998, due to nerves and panic attacks, leg and arm numbness, back pain and shortness of breath. (Record, ("R."), at 72-74A, 86, 110, 172-76.) The claims were denied initially and upon reconsideration. (R. at 60-61, 62, 64-65, 179-80, 183-84.) Mullins then requested a hearing before an administrative law judge, ("ALJ"), and a hearing was held on June 22, 2000, at which Mullins, who was represented by counsel, appeared and testified. (R. at 40-55, 66.)

By decision dated July 18, 2000, the ALJ found that Mullins was not under a disability, the Appeals Council declined review on April 6, 2002, and by order of this court, dated July 29, 2003, the case was remanded for further consideration of Mullins's mental residual functional capacity. (R. at 278-85, 649-70.)

On November 29, 2000, Mullins protectively filed a subsequent application for SSI, while her initial claims remained pending with the Appeals Council. (R. at 312-30.) This claim was denied initially and upon reconsideration. (R. at 302-04, 305, 306-

07.)  After the ALJ held a hearing on June 13, 2002, the ALJ found that Mullins, who was represented by counsel, was not disabled in a decision dated June 24, 2002.  (R. at 239-44, 256-74.)   After the Appeals Council denied review on April 15, 2003, Mullins appealed to this court, which, by order dated February 23, 2004,  remanded the case on the motion of the Commissioner. (R. at 228-30, 646-48.)

On June 2, 2004, the Appeals Council vacated the hearing decisions of July 18, 2000,  and June 24, 2002, and remanded the cases  to the ALJ for further proceedings. (R. at 644-45.)  At this point, both cases were consolidated for a single hearing and decision. A hearing was held on December 1, 2004, at which Mullins was again represented by counsel.  (R. at 806-45.)

By decision dated December 13, 2004, the ALJ denied Mullins's claims. (R. at 635-41.) The ALJ found that Mullins met the insured status requirements of the Act for DIB purposes on August 15, 1998, the date the claimant stated she became unable to work, and continued to meet them through June 30, 1999, but not thereafter. (R. at 640.) The ALJ also found that Mullins had not engaged in any substantial gainful activity since August 15, 1998.  (R. at 640.)  The ALJ found that Mullins's combined physical impairments  were severe in association with borderline intellect, but that she did not have an impairment or combination of impairments listed in or medically equal to one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 641.) He also found that Mullins's allegations of disabling pain and other symptoms were not credible and were not supported by the documentary or other evidence of record.  (R. at 641.) The ALJ found that Mullins had the residual functional capacity, ("RFC"), to perform work-related activities except for work involving lifting and/or carrying items

-3-

weighing more than 15 pounds frequently and items weighing more than 35 pounds occasionally, overhead reaching and exposure to dust, fumes and smoke. (R. at 641.) He further found that Mullins was limited to unskilled, entry level work. (R. at 641.) Thus, the ALJ found that Mullins's impairments did not prevent her from performing her past relevant work as a deli worker. (R. at 641.) Therefore, the ALJ found that Mullins was not under a "disability," as defined in the Act, at any time through the date of his decision and was not entitled to benefits. (R. at 641.) *See* 20 C.F.R. §§ 404.1520 (f), 416.920 (f) (2006).

After the ALJ issued his decision, Mullins pursued her administrative appeals, and the Appeals Council denied review. (R. at 594-96.) Mullins then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. See 20 C.F.R. §§ 404.981, 416.1481 (2006). The case is before this court on Mullins's motion for summary judgment filed November 8, 2006, and on the Commissioner's motion for summary judgment filed January 10, 2006.

## II. Facts

Mullins was born in 1956, which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2006). (R. at 72.) Mullins completed the ninth grade in school and has past relevant work as a deli worker. (R. at 87, 91, 94, 353, 358.) She testified that she had not worked since August 15, 1998. (R. at 809.) Mullins testified she stopped working because of her inability to deal with customers, because she did not want to be around people, because she was unable to deal with the shift and because of her back and her legs. (R. at 812.) She testified she spent most

-4-

of her time at home, watching television, lying around and sitting. (R. at 812.)  She denied having any friends, mostly being visited by her sister-in-law, and she stated that she had not been to church in two years.  (R. at 812-13, 815.)   She claimed that she had suffered from panic attacks three times a week in the past and currently suffered from attacks about four or five times a month.  (R. at 815.)

Norman Hankins, a vocational expert, testified at Mullins's hearing on December 1, 2004. (R. at 809-11, 840-44.) Hankins described Mullins's past work as a deli worker as semi-skilled work that required medium[2] exertion and cake decorating as skilled work that required light[3] exertion.  (R. at 810.)  Hankins testified that with an IQ of 75 and less than a high school education, Mullins could do only entry-level unskilled work. (R. at 811.) The ALJ asked Hankins whether there were any jobs available that Mullins could perform with her educational background and IQ, if she could lift items weighing up to 35 pounds occasionally and up to 15 pounds frequently with no overhead reaching and only moderate exposure to dust and fumes. (R. at 840.) Hankins responded that Mullins could be a deli worker, a waitress, a salad bar tender, a bus person, and could do factory work such as hand packing, assembling and sorting.  (R. at 840.) On cross-examination by Mullins's attorney, Hankins was asked whether a person who often had deficiencies of concentration, persistence and pace could perform such jobs, and he responded that such a person would be unable

---

[2]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2006).

[3]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2006).

-5-

to work. (R. at 843.) When asked if a person with a Global Assessment of Functioning,("GAF"), score of 60 to 65[4] could work and if a person with a GAF score of less than 50[5] would be able to work, Hankins responded that a person with a GAF score of 60 to 65 would be able to work, while a person with a GAF score under 50 would be unable to work. (R. at 843-44.)

Dr. Theron Blickenstaff, M.D., a medical expert, also testified at Mullins's hearing. (R. at 820-22.) He reported that Mullins's recent physical problems included some mild narrowing in the cervical spine, mild ulnar median nerve problems, lung nodules that were some sort of an infectious process, diabetes that had not been well-controlled and a hemochromotosis diagnosis that was made in 1988. (R. at 820-21.) Dr. Blickenstaff testified that at the time of her last insured status in June 1999, Mullins would have had exertional limitations against lifting items weighing more than 35 pounds occasionally and 15 pounds frequently, against overhead work and limitations on exposure to vapors, fumes and dust. (R. at 821-22.) He stated that it would be possible for a person with a blood disorder to have symptoms of fatigue. (R. at 832.)

---

[4]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social and occupational functioning on a hypothetical continuum of mental health-illness," DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDER FORTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994.). A GAF of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32. A GAF of 61-70 indicates that the individual has "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

[5]A GAF of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

-6-

Dr. Margaret Robbins, M.D., a psychological expert, also testified at Mullins's hearing. (R. at 822-40.) She was asked by the ALJ whether Mullins had any psychological limitations between 1998 and 2004. (R. at 823-24.) The ALJ asked Dr. Robbins to address the inconsistency between Mullins's pattern of missing her mental health appointments with her case management and support services, but not missing her medical appointments. (R. at 833.) Dr. Robbins reported that after reviewing Mullins's psychological treatment, it seemed that her symptoms were not of an acute nature and her "treatment has been assigned because of her subjective complaints but maybe she just doesn't need it." (R. at 832-33.) Dr. Robbins stated that the severity of the mental health difficulties correlated more strongly with the progression through the disability system as opposed to any other stressor in her life. (R. at 833-34.) She concluded by saying that the objective mental status reflected in Dr. Pitone's reports did not support Mullins's subjective complaints, and her behavior suggested that she did not need the mental health treatment. (R. at 834.)

The ALJ asked Dr. Robbins whether she agreed with the limitations set by B. Wayne Lanthorn's mental assessment form of April 2000. (R. at 834-35.) Dr. Robbins responded that Lanthorn's assessment seemed to be consistent with Mullins's subjective reports. (R. at 836.) Dr. Robbins also stated that Dr. Pitone's GAF rating of 55 to 60 more accurately matched Mullins's mental status exams, but not her subjective complaints. (R. at 836-38.)

In rendering his decision, the ALJ reviewed records from Dr. Steven Prince, M.D.; Stacey Gipe, P.A.-C; Dr. Randall Pitone, M.D., a psychiatrist for Wise County Counseling Center; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist;

-7-

Samantha Reynolds, B.S., a case manager for Wise County Counseling Center; Medical Associates of Southwest Virginia; Norton Community Hospital; Dr. Michael Hartman, M.D., a state agency physician; Hugh Tenison, Ph.D., a state agency psychologist; Dr. Frank M. Johnson, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; and therapist Eric T. Greene, M.S.C.E. The Appeals Council declined to grant review on May 25, 2006. (R. at 594-96.) Since the Appeals Council did, however, consider additional evidence submitted to it from Frontier Health and Medical Associates of Southwest Virginia, this evidence will be considered by this court in determining whether the ALJ's decision is supported by substantial evidence.[6]

Mullins reported to Dr. Steven R. Prince, M.D., for complaints of numbness and tingling in the extremities and depression on November 30, 1998. (R. at 132.) He noted tenderness over her lumbosacral spine, the sacroiliac, ("SI"), joint, trochanteric bursa and tenderness in both knees. (R. at 132.) Her Zoloft was increased on this date. (R. at 132.) On February 15, 1999, Mullins reported to Dr. Prince that she was doing better on increased Zoloft, but she was nervous all the time with her behavior sometimes being out of control. (R. at 129.) At that time, Mullins presented for routine follow-up for anxiety and arthralgias. (R. at 129.) Dr. Prince reported that she appeared to be anxious throughout the office visit, but her affect was pretty good and she was able to give a clear and concise history. (R. at 129.) Buspar was added to her medicine regime. (R. at 129.)

---

[6]Since the Appeals Council considered this evidence in reaching its decision not to grant review, this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

She returned to Dr. Prince on March 17, 1999, stating that she stayed anxious all of the time and too nervous to do anything both outside or inside the house. (R. at 127.) Dr. Prince noted that Mullins appeared to be very anxious and nervous, seemed hurried, was biting her nails, but was well-dressed and did not appear to be depressed. (R. at 127.) On April 19, 1999, Mullins stated that she was doing a little bit better and that her nerves were improved. (R. at 125.) Dr. Prince noted that her affect was very good. (R. at 125.) She returned in September 1999 without complaining of depression or nervousness. (R. at 123.)

Mullins reported to Dr. Prince on September 28, 1999, that Buspar made her feel funny and that she was no longer taking it and that she was out of Zoloft. (R. at 122.) Dr. Prince discontinued her Zoloft and Buspar. (R. at 122.) She was given Effexor samples. (R. at 122.) On February 8, 2000, Mullins reported back, neck and left arm pain to Dr. Prince. (R. at 188.) Dr. Prince found that Mullins had normal range of motion in her upper extremities, cervical and lumbar spine, a negative Tinel's sign, negative straight leg raising and normal and equal patellar and Achille's reflexes. (R. at 188.) She returned to Dr. Prince on March 6, 2000, complaining of back pain, and for a follow-up of hemochromatosis and depression. (R. at 187.) On June 6, 2000, Mullins saw Dr. Prince for a routine follow-up, and he reported that Mullins seemed to be in no apparent distress and also seemed to be a little bit nervous. (R. at 185-86.)

A Magnetic Resonance Image, ("MRI"), of the cervical spine, taken on February 12, 2000, revealed a bulging disc but no definite evidence of a herniated disc or spinal cord encroachment. (R. at 535.) An electromyogram and nerve conduction study, ("EMG/NCS"), of the upper extremities on March 10, 2000, revealed a

-9-

moderately severe lesion of the left ulnar nerve and a minimal demyelinating lesion of the right median nerve at the wrist. (R. at 533-34.) There was no evidence of cervical radiculopathy or brachial plexopathy. (R. at 534.)

A Psychiatric Review Technique form, ("PRTF"), was prepared on October 15, 1999, by Howard S. Leizer, Ph.D., a state agency psychologist. (R. at 133-42.) He indicated that Mullins suffered from a nonsevere affective disorder and a nonsevere anxiety-related disorder. (R. at 133.) He also indicated that Mullins had a slight restriction in her activities of daily living and in maintaining social functioning. (R. at 141.) He found that she seldom experienced deficiencies of concentration, persistence or pace and experienced no episodes of decompensation. (R. at 141.) On October 18, 1999, Dr. Frank M. Johnson, M.D., a state agency physician, found no evidence of a severe physical disorder which could be expected to reduce the claimant's ability to function as she alleged. (R. at 143.) He concluded that Mullins's allegations were not supported by the medical evidence and were not considered credible. (R. at 143.)

Another PRTF was prepared on January 5, 2000, by Hugh Tenison, Ph.D., a state agency psychologist. (R. at 145-55.) He found that Mullins suffered from an affective disorder and an anxiety-related disorder, but that a residual functional capacity assessment was necessary. (R. at 145.) Tenison found slight restrictions in Mullins's activities of daily living and in maintaining social functioning. (R. at 154.) He also found that she often experienced limitations in concentration, persistence and/or pace. (R. at 154.) He found no episodes of decompensation. (R. at 154.) Tenison opined that Mullins's allegations were partially credible. (R. at 147.)

-10-

Tenison also completed a Mental Residual Functional Capacity Assessment, ("MRFC"), on January 5, 2000, in which he opined that Mullins was moderately limited in her ability to understand, remember and carry out detailed instructions and to maintain attention and concentration for extended periods. (R. at 156-59.) He also found that she was moderately limited in her ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 156-57.)

On January 5, 2000, Dr. Michael Hartman, M.D., a state agency physician, opined that Mullins's allegations of disabling pain were not credible and were not supported by the medical evidence; he found no evidence of a medical impairment that would prevent her from working. (R. at 160.)

B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Mullins on April 4, 2000, and administered the Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), on which Mullins achieved a verbal IQ score of 78, a performance IQ score of 75 and a full-scale IQ score of 75, placing her in the borderline range of intellectual functioning. (R. at 161-69, 448-56.) Her Minnesota Multiphasic Personality Inventory-Second Edition, ("MMPI-2"), profile was rendered invalid, possibly because of consciously exaggerating and/or malingering in an attempt to obtain some goal or secondary gain. (R. at 166, 453.) Lanthorn stated that Mullins was able to persist to task reasonably well and that her WAIS-III results were accurate and valid. (R. at 163, 450.) He diagnosed her under the Diagnostic and Statistical Manual of Mental Disorders Fourth Edition, ("DSM-IV"), with major

-11-

depressive disorder, recurrent, moderate, panic disorder without agoraphobia, borderline intellectual functioning and personality disorder, not otherwise specified. (R. at 166, 453.) He assessed her GAF score at 60 to 65. (R. at 167, 454)

Mullins was seen initially on October 14, 1999, at Wise County Counseling Center, ("WCCC"), where she complained of depression, present from the age of 18 and she reported receiving antidepressants from her primary care provider. (R. at 144.) During this intake, she was diagnosed by Dr. Randall Pitone, M.D., a psychiatrist from WCCC, with dysthymia, major depressive disorder, moderate, without psychosis, and anxiety disorder, not otherwise specified. (R. at 144.) Dr. Pitone assessed her GAF score at 55 to 60. (R. at 144.)

She returned on December 17, 1999, when she saw Eric Greene, a therapist. (R. at 423.) She reported having a bad week with crying spells but was "well overall." (R. at 423.) Greene reported that Mullins was well-dressed, with a euthymic mood and congruent affect. (R. at 423.) Mullins cancelled her next appointment of January 6, 2000. (R. at 423.) She returned to see Greene on February 7, 2000, when she reported continued depression with crying spells and wanting to be alone. (R. at 422.)

On March 8, 2000, Mullins saw Samantha Reynolds, a case manager from WCCC. (R. at 421.) Mullins reported feeling a little bit better but continued to have problems with depression and anxiety and reported having about 10 panic attacks within the previous six months. (R. at 421.) She also reported hearing voices sometimes telling her to kill herself and admitted to suicidal ideation without intent or plan. (R. at 421.) Reynolds reported that Mullins seemed to have a depressed mood and a constricted affect and was somewhat guarded. (R. at 421.)

-12-

Dr. Pitone saw Mullins on March 17, 2000, and opined that Mullins seemed to be sincere and well-motivated toward treatment, with a moderately to severely depressed mood without despondency or any intent to harm herself. (R. at 418-19.) Mullins reported that her depression was worse with moodiness and irritability. (R. at 418.) Mullins did not attend appointments three times in the month of April 2000. (R. at 416-17.) Mullins returned to see Dr. Pitone because of continued irritability and moodiness on May 1, 2000. (R. at 415.) Dr. Pitone noted that she appeared to be moderately to severely depressed. (R. at 415.) Mullins returned to see Reynolds on May 1, 2000, and she reported that she was feeling better and attributed it to the Zoloft. (R. at 414.) She missed her June 1, 2000, appointment with Reynolds and her June 12, 2000, appointment with Dr. Pitone. (R. at 413.) On June 15, 2000, she reported to Reynolds that she was doing fairly well with her Wellbutrin and Zoloft. (R. at 412.)

She reported to Dr. Pitone on July 7, 2000, that she was feeling better on Wellbutrin and Zoloft. (R. at 408.) Reynolds listed Mullins's GAF score as 31 on a contact note dated July 17, 2000. (R. at 407.) She returned to Reynolds on July 26, 2000, stating that her disability was recently denied and she had sunk into a depression. (R at 404.) She expressed passive suicidal ideation without intent. (R. at 404.) Mullins missed her next five appointments with case management. (R. at 397-402.) Reynolds met with Mullins briefly on September 29, 2000, at which time she reported that her panic attacks had increased. (R. at 396.) She rescheduled her next appointment for October 24, from October 10, 2000. (R. at 395.)

Mullins returned to see Dr. Pitone on October 20, 2000, and reported medication compliance and less severe depression, but that she was anxious and very irritable. (R. at 394.) Mullins missed or cancelled her next six case management appointments. (R.

at 386-92.) She returned on January 25, 2001, to Reynolds and reported continued difficulty with depression, anxiety and motivation. (R. at 385.) Mullins cancelled her next appointment on February 28, 2001. (R. at 217.)

Julie Jennings, Ph.D., and Joseph Leizer, Ph.D., state agency psychologists, reviewed the record and completed a MFRC on January 11, 2001. (R. at 462-65.) They found that Mullins was moderately limited in her ability to understand, remember and carry out detailed instructions, in her ability to carry out very short and simple instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances and to sustain an ordinary routine without special supervision. (R. at 462.) They also indicated that she had a moderately limited ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and in her ability to set realistic goals or make plans independently of others. (R. at 463.) In all other areas of functioning, Mullins was deemed not significantly limited. (R. at 462-63.) They opined that Mullins could perform simple, unskilled work in a nonstressful work environment. (R. at 464.)

Jennings also completed a PRTF on Mullins on January 1, 2001, finding that Mullins had an affective disorder and an anxiety-related disorder, but that a residual functional capacity assessment was necessary. (R. at 466-80.) Jennings found moderate restrictions in activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 476.) She found no episodes of decompensation. (R. at 476.) She also opined that Mullins's symptoms were only partially credible and her claimed limitations were inconsistent with those from her

-14-

treating source. (R. at 480.) This assessment was affirmed by Leizer. (R. at 480.)

On January 24, 2001, Dr. Hartman completed a Physical Residual Functional Capacity Assessment, ("PRFC"). (R. at 481-89.) He opined that Mullins was able to occasionally lift items weighing up to 50 pounds and to frequently lift items weighing up to 25 pounds, to stand and/or walk about six hours in a normal workday, to sit for a total of six hours in an eight-hour workday and had an unlimited ability to push and/or pull. (R. at 482.) He imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 484-86.) This assessment was affirmed by Dr. Richard M. Surrusco, M.D., another state agency physician. (R. at 489.)

Dr. Prince completed a Physical Assessment Of Ability To Do Work-Related Activities on December 18, 2001. (R. at 218-20.) Dr. Prince opined that Mullins could lift items weighing up to five pounds occasionally and items weighing up to one pound frequently, could stand/walk no more than 30 minutes in an eight-hour workday, that she could sit no more than three hours in an eight-hour workday, but for only 30 minutes without interruption, that she could never climb, balance, crouch or crawl, but could occasionally stoop and kneel, that she had a limited ability to reach, to handle, to feel, and to push/pull and that she was restricted from working around heights, temperature extremes, chemicals, dust, noise, fumes and humidity. (R. at 218-20.)

Mullins reported to Reynolds on March 13, 2001, that she continued to do poorly, with lack of motivation. (R. at 216.) She reported that she visited her daughter after the birth of her grandchild, but experienced anxiety and was ready to go home. (R. at 216.) Mullins missed her next appointment and cancelled her appointment with Dr. Pitone on May 3, 2001. (R. at 211-12.)

-15-

Dr. Pitone reported on May 31, 2001, that Mullins's mood was moderately to severely anxious and moderately depressed. (R. at 209.) Mullins reported to Dr. Pitone that she had been getting out a little bit more with the assistance of a higher dose of Xanax and that her depression remained "pretty bad" at times. (R. at 209.) On the same day, she reported to Reynolds that she was doing a little better, had babysat her granddaughter several times and went to church the previous two weekends, which she tolerated fairly well. (R. at 207.) Mullins missed her next four appointments from the period of June 28 to August 6, 2001. (R. at 202-06.)

At an August 27, 2001, appointment with Dr. Pitone, Mullins reported forgetfulness, inability to concentrate and some increase in her symptoms of depression. (R. at 200.) She also reported getting lost and confused while driving and only going out with someone else with her. (R. at 200.) Mullins reported to Reynolds on the same date that she was doing poorly with recent exacerbation of her rheumatoid arthritis. (R. at 200.) She also reported running out of Paxil and restarting her Zoloft. (R. at 199.) On September 26, 2001, she reported to Reynolds that she was doing better and attributed it to her recent medication change. (R. at 197.) Reynolds noted that Mullins's mood was improved from the previous visit. (R. at 197.) Mullins missed her next two appointments. (R. at 194-95.)

She returned to see Reynolds on November 30, 2001, and reported that she was doing fairly well and felt that the Paxil was more beneficial than the Zoloft. (R. at 192, 541.) On the same date, Dr. Pitone reported that Mullins was moderately anxious and still had symptoms of depression. (R. at 540.) Mullins missed her next nine case management appointments from the time period of December 27, 2001, to May 28, 2002. (R. at 543, 545-46, 548-49, 554-55, 560.) She did see Dr. Pitone on March 15,

-16-

2002, and she reported that she had a panic attack in Wal-Mart, but made it out of the store with the help of her husband. (R. at 552.) She also reported that she continued to have panic attacks at home, and she reported taking Xanax about twice a day and taking a third one when she had to go out. (R. at 552.)

Dr. Pitone completed a Medical Assessment Of Ability To Perform Mental Work-Related Activities on January 7, 2002. (R. at 221-23.) Dr. Pitone opined that Mullins had not been observed in a work setting, but that she had a satisfactory ability to maintain personal appearance and a seriously limited, but not precluded, ability to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 222.) He also stated that she had the capability to manage benefits in her own best interest. (R. at 223.)

Mullins missed her appointment with Reynolds on May 28, 2002. (R. at 581.) She returned to see Dr. Pitone on June 10, 2002, and she reported she had missed her case management appointments due to intense anxiety and fear of driving. (R. at 579.) She also reported having auditory hallucinations. (R. at 579.) Mullins missed her next two case management appointments with Reynolds on June 17 and July 24, 2002. (R. at 576-77.)She saw Reynolds on July 25, 2002, and stated she had continued difficulties with chronic anxiety and depression and had stopped driving due to being so anxious and confused. (R. at 575.) She also reported her daily routine as sleeping during the day and watching television. (R. at 575.)

At a September 9, 2002, appointment with Dr. Pitone, he noted that Mullins was not doing well, with depression symptoms of low energy, self isolation and intense anxiety, which had rendered her nonfunctional. (R. at 572.) She reported that

-17-

Paxil and Wellbutrin were helpful but she was still significantly depressed. (R. at 572.) Dr. Pitone noted no psychosis or cognitive impairment and that Mullins appeared moderately to severely depressed and moderately anxious with low energy. (R. at 572.) Mullins saw Reynolds on September 17, 2002, and reported feeling a little better and driving herself to her appointment. (R. at 592.) She also reported being on a daily schedule. (R. at 592.) Reynolds noted that Mullins's mood appeared to be moderately depressed with some anxiety. (R. at 592.)

Mullins missed five case management appointments from October 9, 2002, to December 11, 2002. (R. at 585-88, 590.) She returned to see Dr. Pitone on December 18, 2002, and reported chronic nausea. (R. at 583, 741.) Dr. Pitone noted that her mood seemed to be moderately depressed with mild to moderate anxiety. (R. at 583, 741.) At December 18, 2002, and April 14, 2003, appointments with case management, Mullins reported that she had been ill with nausea and vomiting. (R. at 729, 740.) She missed three appointments in this time period. (R. at 731, 735-36.) Dr. Pitone saw her on April 21, 2003, and she complained of physical illness, and he noted that she seemed moderately anxious and moderately to severely depressed with despondency. (R. at 727.) She reported that she remained withdrawn and had few activities. (R. at 727.) She missed three appointments from May 12 to June 12, 2003. (R. at 724-26.) On a note dated June 30, 2003, Reynolds spoke with Mullins over the phone, and she reported staying with her daughter for the previous month and a half. (R. at 723.)

On January 20, 2003, Dr. Prince completed an Assessment Of Ability To Do Work-Related Activities, both Physical and Mental. (R. at 566-71.) He opined that Mullins could lift items weighing up to five pounds occasionally and less than five

-18-

pounds frequently, could stand/walk for a total of two hours in an eight-hour workday, but for only 30 minutes without interruption, sit for a total of two hours in an eight-hour workday, but for only 30 minutes without interruption, and could occasionally climb, stoop, kneel, balance, crouch and crawl. (R. at 566-67.) He also opined that her ability to reach, to handle, to feel and to push and pull were limited. (R. at 567.) Dr. Prince placed limitations on Mullins's exposure to heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity and vibration. (R. at 568.)

On the mental assessment, Dr. Prince opined that Mullins had a poor to no ability to deal with work stresses, a seriously limited, but not precluded, ability to deal with the public, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to demonstrate reliability and to relate predictably in social situations and a good ability to follow work rules, to relate to co-workers, to understand, remember and carry out detailed and simple job instructions, to maintain personal appearance and to behave in an emotionally stable manner. (R. at 569-70.) He also opined that she had no capability to manage benefits. (R. at 571.)

On January 20, 2003, Dr. Prince noted that Mullins had difficulty answering some of the questions which required a lot of thought, and she seemed to have difficulty concentrating, adding that she seemed very depressed. (R. at 751.) Mullins reported that she could not concentrate, handle her finances or go shopping and that she had memory difficulties and chronic pain in her feet, arms and back. (R. at 751.) On a routine follow-up on February 27, 2003, Stacey Gipe, P.A.-C, reported that Mullins seemed to be in no apparent distress. (R. at 750.) Gipe reported on October

-19-

17, 2003, that Mullins seemed to be in no apparent distress, and Mullins reported that her depression was doing okay. (R. at 746.) Gipe gave her samples of Paxil CR instead of Paxil 25mg and Wellbutrin XR 150, stating that she could increase both or one or the other. (R. at 746.)

Mullins saw Dr. Michael W. Wheatley, M.D., on March 2, 2004, with complaints of low back and neck pain and cough. (R. at 744.) She was given Lortab and Celebrex. (R. at 745.) She returned on August 23, 2004, with complaints of headaches and burning, tingling sensations in her feet. (R. at 786.) She returned on January 12, 2005, complaining of joint pain, swelling and redness, especially in her right knee and right wrist. (R. at 622.) Dr. Wheatley found no edema, a good dorsalis pedis pulse, no redness or swelling of either knee, wrist or elbows and that her right knee was grossly stable. (R. at 622.) Mullins had no complaints on January 25, March 29, or April 6, 2005. (R. at 624, 626-27.) On February 23, 2005, Mullins complained of redness around her neck and congestion. (R. at 625.)

Mullins reported to Reynolds on July 10, 2003, that she was doing poorly and still experienced problems with low motivation. (R. at 722.) Reynolds noted that her mood appeared to be anxious and moderately depressed. (R. at 722.) She saw Dr. Pitone and Reynolds on July 21, 2003, and reported continued problems with depression and frequent thoughts about suicide. (R. at 718-19.) Dr. Pitone noted that she seemed to be alert and oriented, calm and cooperative with a constricted affect. (R. at 719.) From August 19, 2003, to September 22, 2003, she missed five appointments. (R. at 712-16.) She reported continued depression and lethargy from October 14 to November 13, 2003. (R. at 706-10.)

-20-

On December 11, 2003, Mullins reported that she was feeling better, both mentally and physically, and had been getting out of her home more often to attend church and a birthday party for her mother. (R. at 705.) She missed her next three appointments until March 2, 2004, when she reported continued symptoms of depression, not feeling like going to church and self isolation. (R. at 694, 700, 701-03.)

Dr. Pitone reported on March 17, 2004, that Mullins still had symptoms of depression and anxiety, but seemed to have adequate control of symptoms and maintenance of function and found her to be alert, oriented, calm and cooperative. (R. at 692.) Mullins missed her April 20, 2004, appointment. (R. at 690.) A Frontier Health DSM-IV Assessment Form completed by Reynolds, dated March 10, 2004, indicated a then-current GAF score of 45. (R. at 696-99.) She reported fatigue and low energy on April 27, 2004. (R. at 689.) She missed her next two appointments on May 25, 2004, and May 27, 2004. (R. at 687-88.)

Mullins cancelled her appointment on July 22, 2004. (R. at 805.) She saw Dr. Pitone on August 23, 2004, reporting having "some depression," but she stated that she was satisfied with the current combination of medicines. (R. at 801.) She also reported going out to visit with neighbors or family. (R. at 801.) Dr. Pitone reported that Mullins was alert, oriented, calm, cooperative, making eye contact, with normal speech and psychomotor activity, and was appropriate in behavior, mannerisms and dress, although her mood was mildly to moderately depressed. (R. at 801.) He added that stabilization or maintenance of the health status or functioning was expected. (R. at 802.) She also saw Reynolds on this date, and stated that her depression would come and go, but she noted that she remained isolated despite having some good days.

-21-

(R. at 800.) She missed her next appointment of September 29, 2004. (R. at 799.)

Mullins returned to see Dr. Pitone on December 28, 2004, complaining of continued low energy and motivation. (R. at 598.) Dr. Pitone reported that she was alert, oriented, calm, cooperative, made eye contact and established rapport, answered questions and exhibited normal speech and psychomotor activity. (R. at 598.) On January 27, 2005, Mullins returned to see Reynolds and reported that she felt "about the same." (R. at 600.) On February 23, 2005, Mullins reported doing okay and that the addition of Cymbalta may have helped a little, but she continued to have poor energy and motivation. (R. at 601.) She also reported getting out of the house a little more visiting family. (R. at 601.)

On March 23, 2005, Mullins reported to Elva Colyer, R.N., a case manager, that she continued to experience depression and anxiety and that she rarely got out of the house. (R. at 602.) Mullins reported to Dr. Pitone that the Cymbalta had not been helpful in relieving her depression. (R. at 605.) Dr. Pitone discontinued her Paxil in order to start Norpramine and ordered an EKG. (R. at 605.) Mullins missed three appointments from March 30, 2005, to May 3, 2005. (R. at 610-13.) On May 6, 2005, Mullins reported to Colyer that her depression had increased, that she was crying more and that she still had not obtained the EKG or started taking Norpramine. (R. at 614.) On May 10, 2005, Mullins reported increased depression symptoms and requested prescriptions for Paxil and Cymbalta. (R. at 615.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI

-22-

claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868–69 (4th Cir. 1983); *Hall*, 658 F.2d at 264–65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

The ALJ found that Mullins met the insured status requirements of the Act for DIB purposes on August 15, 1998, the date the claimant stated she became unable to work, and continued to meet them through June 30, 1999, but not thereafter. (R. at 640.) The ALJ also found that Mullins had not engaged in any substantial gainful activity since August 15, 1998. (R. at 640.) The ALJ found that Mullins's combined physical impairments were severe in association with borderline intellect, but that she

-23-

did not have an impairment or combination of impairments listed in or medically equal to one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 641.) He also found that claimant's allegations of disabling pain and other symptoms were not credible and were not supported by the documentary or other evidence of record. (R. at 641.)The ALJ found that Mullins had the RFC to perform work-related activities except for work involving lifting and/or carrying items weighing more than 15 pounds frequently and items weighing more than 35 pounds occasionally, overhead reaching and exposure to dust, fumes and smoke. (R. at 641.) He further found that Mullins was limited to unskilled, entry level work. (R. at 641.) Thus, the ALJ found that Mullins's impairments did not prevent her from performing her past relevant work as a deli worker. (R. at 641.) Therefore, the ALJ found that Mullins was not under a "disability," as defined in the Act, at any time through the date of his decision and was not entitled to benefits. (R. at 641.) *See* 20 C.F.R. §§ 404.1520(f), 416.920(f)(2006).

In her brief, Mullins argues that the ALJ erred in his evaluation of the her mental impairments. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 14-25.) Mullins also argues that the ALJ failed to accord proper weight to the medical opinions of record. (Plaintiff's Brief at 26-30.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and

his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate explicitly that he or she has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979).

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'

*Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record support his findings.

Mullins first argues that the ALJ failed to properly evaluate her mental impairments. (Plaintiff's Brief at 14-25.) Specifically, she argues that the ALJ erred

-25-

in finding that her only severe mental impairment was a borderline intellect. (Plaintiff's Brief at 14.) The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2006). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1521(b), 416.921(b) (2006). The Fourth Circuit held in *Evans v. Heckler*, that, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (emphasis in original).

Based on my review of the record, I find that substantial evidence does not support the ALJ's finding that Mullins's only severe mental impairment was a borderline intellect. Every psychiatrist, psychologist and mental health worker who has evaluated or treated Mullins has stated that she suffers from depression and anxiety, which affect her work-related abilities. (R. at 144, 166, 421-22, 453, 540, 602, 692, 722.) These diagnoses and assessments are consistent with those of Mullins's physical health care providers. (R. at 125, 127, 129, 751.) Furthermore, three of the four state agency psychologists who reviewed the evidence presented on Mullins's claim found that she suffered from a severe mental impairment other than borderline intellect. (R. at 145-55, 462.) Also, every psychological expert, with the

-26-

exception of one state agency psychologist, who has addressed the issue has stated that Mullins suffers from either a moderately limited or a seriously limited, but not precluded, ability to maintain attention and concentration. (R. at 156, 462, 476.)

It appears the ALJ's bases his rejection of this nearly unanimous psychological evidence on the testimony of Dr. Robbins. (R. at 638.) Dr. Robbins's testimony, however, does not contradict this evidence. In fact, Dr. Robbins testified that the evidence of record supported a finding of moderate difficulty in occupational functioning. (R. at 838.) That being the case, I cannot find that substantial evidence supports the ALJ's finding as to Mullins's mental impairment.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Substantial evidence does not exist to support the ALJ's evaluation of Mullins's mental impairments; and

2.    Substantial evidence does not exist to support the ALJ's finding that Mullins was not disabled under the Act and was not entitled to benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Mullins's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying benefits and remand this case to the Commissioner

-27-

for further development.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(c) (West 2006):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      This 30th day of April 2007.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE